Good morning, Your Honors. My name is Nancy Miller, and I represent Imran Shams. Wait, wait for the USC. You've got to wait for the government to arrive. The budget was passed, so the government is here today. Well, I had seen he was here, Your Honor, and we had said hello, so I knew he was on his way up. But they don't apparently want to pay for the lights. I like the idea of having the candles and the lanterns, because I think those would be helpful. And, Madam Clerk, if I might reserve two minutes for rebuttal. Thank you. And as I said, I do represent Imran Shams in this manner. The main issue with this case is the fact that Mr. Shams is applying for withholding and for cap, and he had an expert who testified and who submitted a detailed report attesting to the clear probability of persecution that Mr. Shams would be subject to. Did he even apply for asylum at the time Imran? No, Your Honor. He had a green card, but he had two convictions, both of which were aggravated felonies, and so he was statutorily ineligible for asylum. The only thing he could apply for was withholding and cap. Well, they don't seem to be a problem, at least what I understand when it came to cap withholding. They're not with regard to cap or withholding. But why would they be a problem with asylum? Because the statute precludes one from applying for asylum if they have an aggravated felony conviction. With regard to withholding or cap, the standard is whether or not the conviction, whether it – even if it is an aggravated felony, is a particularly serious crime. And what – I got it. Okay. I'll just – go ahead. Okay. And the judge did find that it was – the I.J. found it was not a particularly serious crime, although we all agreed it was an aggravated felony. This is a FAR exam question. That brings the issue. Yes. All right. So this is – the question I have is the – your client had an expert witness, but most of the expert witness's testimony seemed to go to Americans and didn't address your client's own situation, which is a Pakistani who had lived in the United States for 25 years and then returned. His expert testimony commented on that in about two places, but overall, as the immigration judge found and the BIA affirmed, did not really cover that situation, your precise situation. Well, Your Honor, I believe that he did, though. He talked about the fact that Mr. Shams had been in the United States for 25 years. He talked about the fact that if he returned – that as a native Pakistani, if he had returned to Pakistan after all this time, he would be considered a spy for the CIA. You know, the problem is that he did say those things. He didn't seem to have any backup for it. I mean, he didn't seem to have any data or basis particularly for that statement, did he? He had said that it was based on his research. If you are asking whether he specifically gave details about what he – what research he had done to find that out, no, Your Honor, he did not. I would suggest, though, that if that did concern either the government or the judge, they should have asked. What do you base that on? And they didn't. And the – the IJ acknowledged what – what Dr. Gabbai was saying and then said that there was no evidence in the record. But there was evidence in the record. Yes. That was his expert testimony. Exactly. Uncontroverted. Yes. And if she disagreed with that or if she found that it did not meet a weight standard, she should have said so. She should have given us her analysis. And she didn't. She simply said, this is what he said. There's nothing in the record that supports this. Well, there was. And it needed to be acknowledged. And it needed to be addressed. So you're talking about the analysis section where she said there's no evidence to suggest that natives of Pakistan who have lived in the United States for an extended period of time face any threat to their life or freedom. And at that point, she doesn't really discuss his statement except to acknowledge that he actually made it. Yes. But she didn't feel that he had adequately established that he would be targeted as a spy simply because he had lived in the United States. But she didn't. But the expert did state that based on his experience and his research, that he felt that it was more likely than not, I think he put the odds at 90 percent, that Mr. Shams would be both subject to persecution, to kidnapping, to torture, and to potentially being beheaded. So what is it about your client? Is your client here today? Excuse me, Your Honor? Is your client here today? No, he is not. What is it about your client that would cause him to be perceived as a Westerner? As he testified, the fact that he's been here so long has affected how he carries himself, how he speaks, how he walks, how he talks. He will look different. Dr. Ghai testified that Pakistan is a very tribal country, and that as also a close-knit Muslim country, unlike the United States, people know your business. And you can, in Los Angeles, you can live here and never know your neighbor. In Pakistan, everybody knows you were away, where you were, that you've come back. And so even without Mr. Shams' statement that he is going to act differently, they're going to know that he's come back and that he was in the United States for all of these years. It wasn't a secret. How old was he when he came here? Well, he's been here for over 25 years. He was 53 at the time that we were in court. So he was in his 20s. He's been here for probably close to 30 years at this point. Did he go to school here? I do not believe so, Your Honor. What work did he do? When he first came here, he had some medical treatment for his eye, and then he worked for his brother at a medical billing company, which is, of course, where he got into trouble. Medicare fraud comes in. Yes, exactly. Not commendable. I grant you. I don't excuse it. But that's not what we're here about. Right. Okay. All right. So what was his conviction for grand theft for? What did he actually do? They submitted billings for services that had never been performed. So it was another kind of medical fraud? Yeah. It was both. Both convictions. In New York, it was Medicare fraud. In California, he branched out to Medi-Cal. But it's essentially the same conviction. I mean, not the same event, but the same type of thing. So the I.J. I think also relied on the fact that he had visited Pakistan a couple times and no harm had befallen him. Well, the I.J. acknowledged that, and certainly the government lawyer brought it out. But I don't think that the I.J. gave that too much weight. I didn't see her decision, and I may be wrong, but I didn't think that she gave that tremendous weight, because it had been many years earlier. It had been in the 90s, and then I think there were four times in the early 2000s. And he had said that he'd been there for no more than two or three weeks at a time, and he went to see his family. And Dr. Gubay testified that things had gotten worse in 2001 after 9-11, but that they had gotten much more severe in the year prior to the hearing in immigration court, which is, of course, when things were falling apart in Pakistan, and the situation was much more severe after he left than during the times he went back and visited. Was he back? Did he return after 9-11? No. No. And I see my time is up. Thank you. Good morning, Your Honors, and may it please the Court. Michael Heiss on behalf of the Respondent to the Attorney General of the United States. Petitioner Sham's two fraud convictions are aggravated felonies that rendered him ineligible for asylum. And this case ultimately comes down to the difference between opinions and facts. Substantial evidence supports the agency's conclusions. Well, the IJA determined that those two crimes were not particularly serious. For purposes of withholding. And he remains eligible for withholding. Just withholding. And cat. Yes, Your Honor. There's a slight difference in the wording of the statute that allows him to seek withholding as opposed to asylum. Yeah. In any event, yes, we're not. There's no dispute as to his removability regarding his convictions. But ultimately the question is whether or not the expert testimony was enough. It's a question of the weight of the evidence. And under the substantial evidence standard of review, this Court cannot reweigh evidence. Whether or not an expert testimony is to be accepted or believed, again, is a question of weight. His wife is a citizen. I'm sorry? His wife is a citizen. Yes, Your Honor. But isn't there law that the IJA is required to explain why it rejects, why he or she rejects the opinion of the expert? Yes, Your Honor. And does this IJA adequately explain it? Well, the IJA explicitly on page 6 of the decision, that's administrative record page 62, acknowledges, quote, the crux of his case is Professor Gabbay's testimony. So that frames the entire discussion of all the evidence that is adduced in the case. It's not evidence. Well, it is. It's evidence. It's whether or not it's enough. There's no evidence in the case. It's a question of whether or not it's adequate evidence. To say there's no evidence. No evidence in the case. But the IJA doesn't explain that. See, that's the problem. The IJA doesn't. The IJA says, as Judge Peyerson says, there's no evidence, but doesn't explain why it can totally just disregard the expert witness's testimony. Well, that's, it is actually, the explanation is there, inasmuch as the expert's testimony and also his own report never cite to any particular evidence. But he wasn't, he was qualified as an expert. Correct. And he gave an understanding of Pakistani society and of the perception they would have of this person coming back after 25 years in the United States and the fact that they would assume that he was spying and that people were being recruited to spy and so on. I mean, I asked this question before, if you need any further backup, but, but, I mean, you have, I don't know why it's any better or worse than the country reports. It's somebody who purports to know, giving essentially a summary of what he says he's learned by, through his research. And why isn't that evidence? His opinion is basically a form of evidence. It is evidence.  It's a form. I mean, his opinion was based on a set of assertions that in turn were based on his studies and understanding of the area as an expert. Well, if they were indeed based on his studies or research, he should have cited it. Yes, it is what he said, but he never cited it. No, he doesn't have to cite it. He was, the I.J., he listed what he had done, his credentials. The I.J. accepted him as an expert, and then he gave his expert testimony. And the I.J. has to have some kind of a basis for rejecting what he says. It is evidence. Yes. Now, so why did she reject his testimony? Because it wasn't compelling, nor was it supported by anything outside of his own opinion. I mean, that's what's troubling. It doesn't need to be. If it's evidence like the witness, it's like the petitioner's own testimony. It doesn't need to be corroborated by anything else. Well, an immigration judge can demand corroboration of even credible testimony. Again, these are opinions. Now, now, but this is an expert testifying. Yes. And the weight to be given to that evidence is up to the fact finder. Have you ever litigated outside of immigration cases? I have, Your Honor. Okay. Well, you understand what expert testimony is then? I do. Extensively, yes. Right. And then so you understand when there's nothing to rebut it, you can't just disregard it. I mean, there has to be something counter to it. Under Primiano v. Cook, it's a question of weight. It's whether or not the evidence taken as collectively is enough. That's true, but that's the problem here, that the IJ said there was no evidence rather than that he didn't give it weight. And the BIA said something cryptic about he, here we go. The immigration judge did acknowledge the expert's testimony but did not find it or do not adequately address how Pakistanis who returned after living in the United States or the West for an extended period of time are treated. That seems to me to say that unless it's in the country reports, we're not going to believe an expert. And then we could just treat the expert as having said nothing. So in both instances, they seem to be saying not that we have reasons to not give it weight, but that it's not evidence because it's not in the country reports. Again, it's a question of whether or not there is enough for the expert to have made his opinion factually based. But that would be fine if that's what they said. But what they said in both instances was that there was no evidence. Well, the Board, as Your Honor just noted, it's a question of sufficiency. The Board said did not find his report to be sufficient. Because the country conditions material do not adequately address. They didn't say the country conditions materials work to the contrary. They said unless it's in the country conditions materials, we're not going to take it. That I would say is a narrow reading of what country conditions materials means. Yes, the immigration courts routinely rely on the State Department country condition reports. This isn't citing that particular report. This is saying country conditions materials in general. And what we have here is an expert that provided an opinion. And he provided a CV replete with articles he's written, what was supposed to be the basis for his opinion. And yet he never cited a single one of those in his report or in his own testimony. He just never made a link. And as Judge Wardlaw was asking earlier, it's a question of what his testimony goes to. That would be for cross-examination. And it was. Yeah. And the judge also inquired about these issues and simply found that no link was made. And as Judge Wardlaw pointed out, his testimony was about Americans. Westerners having issues in Pakistan, not returning Pakistanis. There's nothing in the record to support that. No, he actually. Let me go to the weight. Yeah. Evidence of his testimony was there. He had two places where he brought it. Yes. No. It is evidence. It's actually also, it makes sense to me that, I mean, even without the expert, it makes sense to me that someone who's lived here for 25 years and went, returned to Pakistan, which, according to this expert anyway, is largely under the control of the Taliban, that they would have some problems. Again, it's his burden to prove that. It's the applicant's burden to prove his eligibility for the relief sought. Somebody comes here and they're, you know, in their 20s. They're here for 25 years. They become imbued with our culture. One of the first things I learned the first time I went to Europe was that we're all products of our culture, everyone, products of where we grew up, too. So he's here in the United States for 25 years. We want people to come here to assimilate, become part of our culture. But not commit Medicaid fraud. Now, that has nothing to do with the withholding or cash. We're talking about assimilating an individual into this country. What kind of a, what kind of a, wait a second, wait a second. That was out of line. That was really out of line. Out of line. That was a very snide remark, and it's unrelated to the two claims that we are considering here, and you know that. The I.J. said that and the BIA said that. So to make a snide remark about somebody's character like that is inappropriate. You want me to give you a list of all the agencies of our government that have done little things like that? He was sentenced to 52 years in prison, Your Honor. What? He was sentenced to 52 months in prison. That's not an insignificant sentence. Well, whatever. I mean, the BIA then could have disagreed. I mean, the government didn't appeal that consideration. It's out of the case. And that's why you are out of line, because it's out of the case. I apologize for that, Your Honor. In any event, the question here is whether or not he satisfied his burden of proof. And, yes, he has been here for an extended period of time, but nothing in the records shows that he's westernized. What was the question I asked you when you interrupted me? I had not heard a question yet, Your Honor. Well, I was in the midst of one, wasn't I? Well. In any event. It doesn't make any difference. Go ahead. Well, whether or not an individual has satisfied his burden of proof, including whether or not his expert testimony is reliable, is a question of weight. And under the substantial evidence standard of review, this Court cannot reweigh evidence. Can I just ask one question? You cannot reweigh anything. Wait. Can I ask a question? Sure. Is there anything that contradicts either his testimony or his expert's testimony and report? It's an absence. Absence of anything that confirms it.  You have the expert's opinion that he says is based on his research, and yet he doesn't cite to a single source. Okay. So, but my question is slightly different. Is there anything that is contradictory to any of what he put in? Not explicitly in the record, no, Your Honor. Okay. Thank you. Again, that's a quantum of evidence question. He does talk about the society. He does talk about the problems created by drones, anti-American sentiment in the country. And, you know, it's very easy to spot people who have lived in our country, and you see them somewhere else. And it's the way they dress, the way they walk. It's just that difference that just stands out. And so it's, I mean, you can tell when you look around the streets many times where people are from. It's not that hard. The question is whether or not the record here supports that conclusion, whether or not he provided enough evidence to establish that he's westernized. I've seen a lot, you know. There's a lot of this expert stuff. And here's a guy who comes up. He's got a whole analysis. He sets out his whole life story, his CV, the books that he's done, how many times he's testified in court. And it's all there. It's all there. What's not there is... How would you distinguish this evidence from, you may not be familiar with, but we see it all the time, these gang experts who testify in criminal cases, right? And they come in and they say, you know, I'm an expert because I've, you know, done a lot of stuff with gangs. And gangs typically, they do this. And typically young people come into the gang and want to prove themselves. And when they do something, it's probably for the purpose of forwarding the gang. And they use certain language with someone. And this is all accepted as no one ever says, well, you know, how do you know this? He said how he knew it. I'm an expert. And, frankly, I find it disquieting, but it's used all the time in criminal cases. How is this different? How is this different? Why? That sounds like it's personal experience. Well, yeah, it's a personal experience. They were actually gang members or affiliated with the gang. No, they weren't gang members. They were just people who claimed to have, you know, be around gangs a lot. I mean, police officers and stuff. They study gangs. What? They study gangs. They come in and testify about the structure of gangs. Right. They come in and they study gangs and they testify about the structure of gangs. How is that different than this? It's all a question of the weight of their evidence. You see, that's the problem here. That's not what happened. They said there was no evidence. And then they said the board corrected that. No, the board didn't correct it. The board said that he was right, that there was nothing in the country conditions reports that supported this. Again, the board stated the immigration judge did acknowledge the expert's testimony but did not find it or his report to be sufficient. That's not saying there's no evidence. Yes, the immigration judge may have said there was no evidence. But they said why, because there was nothing. That's a misstatement. Right. But in any event, it's a question of sufficiency. They're misconstruing the evidence before the FDA. I mean, in some ways I don't think any of it is right, but we do it all the time. Yeah. Okay, listen. You owe us 4 minutes and 34, 5 seconds the next time you come here. And better weather. I will promise to bring that with me. No, we owe you better weather. You're getting better weather. I told you it would stop raining. Yes. Well, you did say so ordered, Your Honor. So ordered. I did say that. You have remarkable powers. I've got two good stories to tell you. We stopped a terrible rain on Okinawa, a friend of mine did, by something like that. But I'll save them for you when you attend my 100th birthday. I would appreciate the invitation, Your Honor. Okay. You've got it. Thank you. Hope to see you there. All right. Thank you, Your Honor. Now, listen. You don't need to tell us anymore. I was just going to ask if you have any questions, Your Honor. Yeah. Okay. No, we're fine. We got it all. Thank you. All right.
judges: Pregerson, Wardlaw, Berzon